FILED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

02 FEB 19 FH 12: 57

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| SHIRLEY FIALKOWSKI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) CIVIL ACTION NO. 99-RRA-3293-S |
| | ) |
| TOGO WEST, JR., SECRETARY | ) |
| OF VETERANS' AFFAIRS, | ) |
| | ) |
| Defendant. | ) |

**ENTERED**

**FEB 1 9 2002**

## MEMORANDUM OF OPINION

The plaintiff, a female Caucasian, is a nurse who was interested in three Veteran Administration jobs. She claims that she did not get any of those positions because of her race, Caucasian, and/or her age, which was over forty (40). The position of Emergency Room nurse at the VA hospital in Birmingham was awarded to Marleni Oritz, apparently an Hispanic. Mary Johnson and Kyle Hodgens were selected to fill two nurse positions in the Cardiac Intensive Care Unit at the Birmingham hospital --- Johnson was black and under the age of forty (40), and Hodgens was white and under the age of forty (40). The position of Nurse Practitioner at the VA Clinic in Huntsville went to Karen Whisenant, a white person under the age of forty (40).

The plaintiff filed EEOC claims. The administrative judge found in favor of the defendant. The plaintiff appealed, and the "Final Agency Decision," issued by the

Director of Employment Discrimination, Complaint Adjudication, Department of Veteran Affairs, concluded that the plaintiff had not shown that her "non-selections" were due to her age or race. The plaintiff then filed her complaint with this court.

The defendant, the Secretary of the Department of Veterans Affairs, has filed a motion for summary judgment. That motion is ready for adjudication. The Secretary has filed a brief in support of his motion, the plaintiff filed a response in opposition, and the defendant filed a reply to the plaintiff's response. Both parties have submitted summary judgment evidence. The court has considered the parties' arguments as articulated in their briefs, and the evidence relied on by the parties as referenced in their briefs, and the court will base its rulings on those arguments and evidence. Also pending is the defendant's motion to strike the plaintiff's latest summary judgment submissions.

### Defendant's Motion to Reconsider

On August 22, 2001, the plaintiff filed a motion for leave to file late submissions in opposition to the defendant's motion for summary judgment, the justification for which was set out in the motion, and mainly had to do with lack of "thorough communication" when the original counsel left the firm. (The case stayed with the same law firm.) The motion was summarily granted. The defendant, however, filed a motion to reconsider, challenging the sufficiency of the grounds stated in the plaintiff's motion and asserting that it would be unfair to the defendant to allow the plaintiff at this late date

-2-

to file additional submissions. The court then ordered the plaintiff to state what submissions was contemplated.  Instead, the plaintiff filed the additional submissions, which consisted of argument, along with the plaintiff's declaration which contains factual assertions.  Many of those assertions are repetitive, some are unnecessary (the defendant has admitted that the plaintiff has made a prima facie case with respect to every claim), while others are conclusory and therefore not proper summary judgment evidence.[1]

After consideration of the grounds stated in support of the plaintiff's motion for leave to file late submissions, the statements in her declaration, the fact that she had been allowed already to file a supplemental submission on August 1, 2001, three weeks earlier,[2] and the fact that the plaintiff had already offered her testimony in deposition, the defendant's motion to reconsider is due to be granted, and the order granting the plaintiff leave to file the submissions in question is due to be set aside and that motion denied and the submissions stricken.


## The Claims

The defendant concedes that the plaintiff has established a prima facie case of age and race discrimination in each instance she has claimed such discrimination.  Therefore,

---

[1] If there were new evidence in this declaration, the defendant could be prejudiced by it, as discovery had been long closed.

[2] The plaintiff's August 1, 2001 motion for leave to file additional submissions came after the plaintiff's original counsel's motion to withdraw was granted on July 13, 2001.

the issues remaining are the familiar ones of whether the defendant has articulated

legitimate, non-discriminatory reasons for not selecting the plaintiff, and, if so, whether

the plaintiff has established evidence of pretext sufficient to allow her claims to proceed

to trial. Unless the plaintiff, who carries the ultimate burden of proving her action, is able

to show some evidence with respect to each element of her claims, all other issues of fact

become immaterial and the moving party is entitled to judgment as a matter of law. *See*

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Bennett v. Parker*, 898 F.2d 1530 (11th Cir.

1990).

*Emergency Room Staff Nurse Position*

Applications for the emergency room position were being considered in or around

March, 1997. The selecting official for this position was Erma Jackson, nurse manager for

the emergency room. Jackson's failure to recommend the plaintiff terminated her

application. In her declaration, Jackson states her three reasons for not recommending the

plaintiff:

> In March of 1997 while reviewing applicant folders for a staff nurse position in the
> Emergency Room, Jo Anne Dawkins, the Nursing Recruiter, introduced Ms.
> Shirley Fialkowski to me. During our brief conversation in Ms. Dawkins' office,
> Ms. Dawkins informed me that Ms. Fialkowski was interested in a Nurse
> Practitioner position. Upon being informed that Nurse Practitioners were not
> utilized in the ER, Ms. Fialkowski stated she would be interested in any position.
> As I left Ms. Dawkins' office, Ms. Fialkowski stated she might be interested in the

ER. Our conversation ended with me informing Ms. Fialkowski that her folder would be reviewed.

Ms. Fialkowski was one of several applicants being considered for the ER position. Her folder was returned to Ms. Dawkins without an interview for the following reasons: 1) The professional references were questionable in that one was from a physician with "Fialkowski" as the last name. A copy is attached to this declaration as Exhibit A, 2) A personal reference was submitted, however, it did not address Ms. Fialkowski's skill as a professional nurse. 3) Ms. Fialkowski listed a work experience at the University of Alabama (UAB) Hospital. However, she did not submit a reference covering the six years she worked there as a staff nurse.

References are very important in the initial applicant phase. Ms. Fialkowski's folder was considered by me to be incomplete. Ms. Dawkins was informed of the above information relating to the references. A specific request was made to obtain a reference from UAB during the time Ms. Fialkowski worked there as a staff nurse from 1991-1996. After several weeks, this information was not provided and Ms. Fialkowski's folder was returned to Ms. Dawkins' office. Applicants with completed folders including adequate references were reviewed and subsequently interviewed for the staff nurse position in the ER.

Maleni Ortiz, RN, who worked at Martin Army Medical Center was selected for the ER position. She met the educational requirements, medical/surgical years of experience as well as received high recommendations from her form Nurse Manager.

Ms. Fialkowski and I met by chance. She initially expressed a strong interest in working as a Nurse Practitioner. She later indicated an interest in the ER. She was inimically considered fro the staff nurse position along with the other applicants. However, she was not a viable applicant and subsequently was not interviewed for failure to complete the initial application process.

*Jackson Declaration*, Defendant's Exhibit 1, ¶¶4-8.

Dawkins, nursing recruiter, stated in her declaration that the plaintiff's letters of recommendation were not current, and that she asked the plaintiff to update her application by submitting current recommendations:

Ms. Fialkowski's application for this position was not complete. Her letters of recommendation were not current. Ms. Erma Jackson, the Nurse Manager for the Emergency Room, had expressed an interest in interviewing Ms. Fialkowski. I talked with Ms. Fialkowski numerous times concerning her application and her interest in employment with the Birmingham VA Medical Center. Ms. Fialkowski was asked to update her application and provide current recommendation letters. This she never complied with. She was thus not considered for the Emergency Room position, which I understand she is alleging discrimination about.

There is no dispute that Ms. Fialkowski's application was misplaced sometime in 1996. I made numerous telephone calls in an attempt to have her rebuild it. She did in fact reconstruct this for us.

*Jo Anne Dawkins Declaration*, Defendant's Exhibit A2, ¶¶4-5.

The plaintiff contends that the defendant's claims of deficiencies in her application were pre-textual because of the following evidence:

a. With respect to the plaintiff's failure to provide references for work she had performed at the University of Alabama Medical Center, the plaintiff states that the defendant admitted in discovery that there was no written procedure requiring this type of reference or even defining the term reference. Dawkins admits that this policy is not in writing, but states that it is nevertheless policy:

There is a policy of the Birmingham VA Medical Center in hiring nurses. As I explained in answering interrogatories, the policy is unwritten but it is the standard practice of the Birmingham VA Medical Center. Each application must contain three current recommendations. Recommendations are considered current as long as they are six months old or less. One of the recommendations must be from the applicant's current supervisor.

*Declaration of Jo Anne Dawkins*, Defendant's Exhibit A2, ¶ 2. The plaintiff has not cited any authority stating that policy must be written in order to be valid. The uncontroverted evidence is that there was a reference policy, albeit unwritten.

b.   The plaintiff states that the defendant admitted that her application was misplaced some time in 1996, and that the plaintiff reconstructed her application when requested to do so. The plaintiff does not explain what it is about this fact which indicates that the stated deficiencies in the plaintiff's application stated are pretextual. If the has in mind the currency of her letters of reference, that subject is discussed, *infra*, and does not constitute evidence of discrimination.

c.   The plaintiff questions the criticism of Dr. Fialkowski as a personal reference. Clearly, when an applicant and the person giving a letter of recommendation both have the same last name, especially a last name that is not a common last name, the question is raised of whether the applicant and the person giving the recommendation are related. If they were related, it is reasonable to question the objectivity of the recommendation. In this case, the plaintiff and Dr. Fialkowski had been married to each other but were divorced at the time in question.

d.   Finally, the plaintiff states that the defendant "equivocates" as to the reasons for her nonselection in asserting that the nonselection was due "at least in part, to her own failure to submit current references." *Plaintiff's Response*, p. 3. This quote comes

-7-

from the defendant's brief, not from summary judgment evidence.  Moreover, there *were* other reasons that the plaintiff was not considered for the ER position.

Once the employer has stated legitimate, non-discriminatory reasons for failing to hire an applicant, the plaintiff must show that *every* reason given by the employer was pretextual. *Combs v. Plantation Patterns*, 106 F.3d 1519 (11th Cir. 1997). Even though the plaintiff discusses the question of the currency of her letters of reference, currency is not an issue here, for it is *Jackson's* reasons for the plaintiff's nonselection which count, as Jackson was the person who decided whether or not to recommend the plaintiff, and, when Jackson decided not to recommend the plaintiff, the plaintiff's package was not sent on up the hiring-consideration ladder.  If, however, currency *were* a reason for rejecting the plaintiff's application, it was not pretextual: in the plaintiff's assertion that she "can hardly be held accountable for an in-house administrative snafu which [caused the currency problem and] held up her application process," the plaintiff acknowledges that "currency" was not a cover-up of discrimination but a mere snafu. *Plaintiff's Brief*, p. 6.

*ICU Positions*

The person who allegedly discriminated against the plaintiff in this claim was Juan Morales. Morales became chief of the nursing service in September of 1996. In his deposition, Morales stated the procedure for reviewing applications:

Q. Okay. And is it the normal course of business that the nurse managers will do the interview and then recommend who to select?

A. Right. The process is that the nurse manager will get with my administrative assistant and go through the files, what's available. If we don't have any files available, then we go with an ad in the paper or we go with an ad through the medical center. The nurse manager does the interviews. And they make recommendations, but I make the final selection.

*Morales Deposition*, pp. 8-9. He further explained:

The only time I review applications is once the nurse manager makes their final selection, or their recommendation is final that this is the person that they want to bring on board. Then it goes from there to the associate of that area. And the associate concurs with it or doesn't concur with it, whatever, then it comes to me for final approval. And I make the final selection. So if the nurse manager does not forward that name to me, it will never get to my desk.

*Id*. at 13-14. The procedure, then, was that the nurse manager interviewed applicants. If the manager recommended an applicant, his package went to the associate chief nurse for her agreement or disagreement. The next stop was Morales, who made the actual decision to hire or not hire applicants.

Aida Baltazar was Nurse Manager of the CVICU. Jane Hebb was Associate Chief Nurse, Nursing Service for Acute Care. Baltazar got the plaintiff's package from Dawkins. Baltazar interviewed the plaintiff and, instead of merely recommending her, offered the plaintiff a position in the CVICU. The plaintiff's package then went to Hebb, who passed it on to Morales.[3] At this time, Morales was reorganizing the entire nursing service. His goal was to combine two medical units with one nurse manager, and two

---

[3] Whether Hebb concurred with hiring the plaintiff is not known.

surgical units with one nurse manager. The defendant claims that Morales "nonselected"

the plaintiff because of the reorganization.

Morales explained what the reorganization was about:

> I was going - - also at the same time I was reorganizing the service. It's a practice
> that usually any new manager that comes in and has a sort of specialty like nursing
> service, look at what type of changes have to be changed management-wise,
> staffing-wise, resource-wise. And at that point I decided to hold on to any
> selection or bringing anybody on board until I had a better feel as to where could
> we use other resources or did we have resources available in-house.

*Morales Deposition,* p. 10.

Morales points out that Baltazar did not have the authority to offer the plaintiff

a position, as hiring was his prerogative alone. Morales states, "I did not review any of

the applications submitted by Ms. Baltazar prior to canceling the selections Ms. Baltazar

had made without authority . . . I reorganized the nursing service and I never looked at

the applications of the individuals Ms. Baltazar wanted selected." *Morales Declaration,* ¶¶

6-7.[4] Morales testified:

> Q. Okay. Now, when — as I understand it, the positions in Ms. Baltazar's area
> were vacant when you came on board; is that right?
> A. Right.
> Q. Okay. And after you came on board, you started reviewing the situation to
> see if you wanted to do a reorganization; is that right?
> A. Well, I was already doing the reorganization.
> Q. Now, when Ms. Baltazar presented those recommendations to you, you
> decided not to select. Did you discuss that with Ms. Hebb?
> A. Yes.
> Q. Okay. And do you remember what all you told her about your reasons for
> not selecting any candidate at that time?

---

[4]Attached to Morales' declaration are three complex organizational charts.

A. We told Ms. Baltazar — or at least — I didn't tell Ms. Baltazar, but the message was that, you know, we're reorganizing the units and I want to hold on before I make a commitment or any type of selection.

*Morales Deposition,* pp. 23 - 24.

Morales filled the positions with two "in-house" persons, Mary Johnson and Kyle

Hodgens.  Hebb stated their qualifications:

Mary Powe Johnson, an African American female under the age of 40 was a selectee for the Cardiac Intensive Care Unit in which Ms. Fialkowski claims she was discriminated against.  Mary Powe Johnson was a student nurse under the Student Nurse Technician Program.  Another selectee for the Cardiac Intensive Care Unit was Kyle Hodgens, a Caucasian male under the age of 40.  Mr. Hodgens was under the VALOR program.

The Student Nurse Technician Program attached as Exhibit A allows student nurses in good standing to work at the Birmingham VA while they are in school.  Ms. Johnson was under this program and worked in the Cardiac Intensive Care Unit while in school.  She was subsequently hired at the Birmingham VA in the Cardiac Intensive Care Unit.

The VALOR Program, attached as Exhibit B provides outstanding students an ability to develop competencies in clinical nursing while under this program.  This program was initiated in 1990 and Exhibit B is a sample of such a program which was in existence when Mr. Hodgens worked in the Cardiac Intensive Care Unit.  Mr. Hodgens was later hired in the Cardiac Intensive Care Unit.

*Declaration of Jane Hebb,* Defendant's Exhibit C5, §§ 6-7.[5]  Thus, two student-employees

were selected over the plaintiff.

The plaintiff challenges the reasons stated by the defendant for nonselecting her:

Baltazar did not have the authority to hire the plaintiff, and Morales, who did have the

authority, did not select her because of his reorganization of the nursing service.  The

---

[5] There are two paragraphs numbered "6."

plaintiff asserts that the reorganization explanation "must be examined in the context of

a credibility issue." *Plaintiff's Brief*, p. 5.

The plaintiff asserts that Morales' credibility is called into question by

contradictory testimony. The plaintiff points to Hebb's testimony which shows that

Morales discussed with her discrepancies in the plaintiff's social security number and the

currency of the plaintiff's references:

> Q. Okay. Did Mr. Morales ever have any conversations with you about why he
> chose not to fill that position?
> A. The only thing that I can recall specifically - - I do remember there was a
> question about a discrepancy in social security numbers and currency of
> references. But he and I did not have a formal conversation about the
> nonselection.
> Q. Okay. With the discrepancy in the social security number, do you remember
> how you go that, or how you heard that?
> A. I don't know who I heard it from.
> Q. Okay. Other than Mr. Morales, did you discuss Ms. Fialkowski's application
> with anyone else?
> A. Probably Mrs. Dawkins.
> Q. Okay.
> A. But just to make sure, I guess, that she knew the information too.
> Q. Okay. And was there anyone else that you can think of that you might have --
> A. I informed Ms. Baltazar.
> Q. And that was about the discrepancies?
> A. No, just the nonselect for Mr. Morales.
> Q. But with the social security number, just Mr. Morales and Ms. Dawkins?
> A. Yes.
> Q. Okay. And do you recall what the discrepancy was or how it came about?
> A. No.
> Q. It was your information that there was just a problem with it?
> A. Right.
> Q. Okay. Do you know if there were any other problems with any other of her
> numbers, like her licensing number or anything like that?
> A. No.

> Q. Okay. And in regards to her references, do you remember what was stated by her reference?
> A. Nothing other than there was a question about the currency of them; how old were they?  Did we have current references?

*Hebb Deposition*, pp. 8-10.[6] The plaintiff also states that Hebb did not mention reorganization as the reason for her nonselection.

The defendant responds that Hebb was not asked in her deposition about reorganization, and that, when she was asked whether Morales discussed anything other than social security numbers and references, Hebb answered that those two things were not necessarily Morales' reason for his nonselection of the plaintiff:

> Q.  . . . So as far as you know, just the reasons for her nonselect was the discrepancy in the social security number and a question about the currency of her references.
> A. I do not know any specific reason why Mr.  Morales chose to nonselect her.
> Q. Okay, but you never heard Mr.  Morales say anything other than those two things about Ms.  Fialkowski, is that right?
> A. No.
> Q. Not that those were or were not the reasons, but that's the only two things you hear from him, is that right?
> A. Yes.

*Hebb Deposition*, p. 10.

---

[6] The defendant points out that Dawkins stated that letters of recommendation or references are considered current if they are dated within six months of the application date. Dawkins testified that the plaintiff's references were not current: "At the time the application was received, the letters may have been current. But at the time they were referred, they were not current." *Dawkins Deposition*, p. 16, lines 20-23. Dawkins further testified that the plaintiff's packet had been misplaced and was never recovered, and that the plaintiff submitted another application package.  Apparently the letters were not current because the plaintiff's package had to be re-submitted. The plaintiff asserts that she "can hardly be held accountable for an in-house administrative snafu which held up her application process." *Plaintiff's Brief*, p. 6.

Finally, the plaintiff contends that an e-mail message sent from Baltazar to Hebb and answered by Morales is "most damaging." *Plaintiff's Brief*, p. 6. Baltazar wrote: "I still do not understand why you recommended stopping the hiring of Kay Alexander and Shirley Fialkowski to SICU and CVICU." *Plaintiff's Exhibit G*. The defendant counters that Dawkins' testimony concerned the ER position, and neither her deposition nor her declaration establish that she had personal knowledge of events concerning the plaintiff's application for a position in an intensive care unit. When asked if she recalled the positions the plaintiff had applied for, Dawkins stated, "I only remember one position that she applied for and that was the ER." *Dawkins Deposition*, p. 6. The defendant again states that it was Morales who had the authority to hire, not Dawkins.

Although Hebb's testimony is somewhat lacking in clarity, it does appear that even though Morales states that he did not *open* the plaintiff's file, he did at least *discuss* the plaintiff's application with Hebb, and thus it can be argued that Morales did not reject the plaintiff only because he was reorganizing the nursing service. However, if the currency of her letters of reference were indeed a reason for rejecting the plaintiff's application — the defendant contends that it was not — the plaintiff herself characterizes any such problem as a "snafu," not an act of discrimination.[7] As to the explanation of reorganization itself, however, the court essentially agrees with the plaintiff's statement

---

[7] The plaintiff does not state an argument concerning different social security numbers.

-14-

that "no reason whatsoever for rejecting [the plaintiff's] application is actually given," in that there has been no explanation by the defendant why, in the eyes of Morales, reorganization acted as a disqualification of the plaintiff. *Plaintiff's Brief*, p. 5. Therefore, although it might be a close question, it appears that there is evidence sufficient to create a factual issue as to whether reorganization was the real reason for Morales' nonselection of the plaintiff.

*Nurse Practitioner at Gadsden Outpatient Clinic*

Dr. Mark Stanton was the hiring authority for this position. Stanton testified that a nurse practitioner at a clinic had to be able to perform certain tasks by herself, without the presence of a physician:

> A. As a nurse practitioner, our expectations were that the individual would be able to work independently, to see patients who presented a broad range of complaints, both acute and chronic. That the individual would be able to work without a physician physically present in the building.
> Q. Uh-huh.
> A. And would be able to perform histories, physicals, make diagnoses, therapeutic plans. Would be well versed in preventive medicine issues. Would be capable of handling acute emergencies.
> Q. Okay.
> A. Again, without a physician physically present in the building.

*Stanton Deposition*, pp. 11-12. Stanton testified that the plaintiff did not have the autonomous work experience he required:

> Q. Okay. And do you recall what Ms. Fialkowski's qualifications were in that area?

A. My recollection is that she had worked for a little more than a year for a physician practicing primary care. I do not recall whether he was a general internist or family practitioner.

Q. Okay.

A. I do know from our interview that the primary relationship with a nurse practitioner with that clinician was that Ms. Fialkowski obtained the initial history, performed a portion of the physical examination. The physician with whom she was working would then enter the room, confirm the initial information gathered by Ms. Fialkowski, and would formulate the diagnostic plan into the therapeutic plan. Ms. Fialkowski had not had experience in that setting, working autonomously without having intervention seen by the clinician.

Q. Okay. Now, when you say that she didn't have autonomy there, would it depend on where she was or is that just your recollection of what transpired in the interview?

A. I'm not sure I follow what you're asking.

Q. Okay. In response, saying she didn't have autonomy where she was there for that year, you say you think it was Alabaster. Would there be any other places that you can recall where she might have gained that experience?

A. I don't recall any particular place where she had worked independently without a physician physically present in the building.

Q. Okay. Do you recall any conversation or any thing involving her work with the Jefferson County Department of Health?

A. I'd have to review her C.V., perhaps that might refresh my memory.

*Stanton's Deposition*, pp.12-14. Stanton testified further concerning the Alabaster position::

> My recollection is that her experience as an adult geriatric nurse practitioner was with the clinician who reviewed every patient. And that she did not have independent function and was not involved in making diagnostic and therapeutic plans. And was not involved in explicitly communicating the gist of those plans to a patient. My understanding is that she functioned more as an assistant rather than as an independent clinician during that time that she worked as a geriatric nurse practitioner.

*Id.* at 23. Dr. Stanton also testified that he did not recall "any particular place where [the plaintiff] had worked independently without a physician physically present in the building." *Id.* at 13.

Although the plaintiff, in Stanton's opinion, did not have the "type of autonomous experience required," *id.* at 14, which was the "prime reason" she was not selected, *id.* at 24, there were secondary reasons he did not select the plaintiff. Stanton stated in his declaration:

> I am familiar with this lawsuit and the allegations that Ms. Fialkowski has made based upon the fact that she was non-selected for a position as a nurse practitioner in the VA Community Clinic in Gadsden, Alabama.
>
> I personally reviewed Ms. Fialkowski's resume and interviewed her for the Gadsden position. I did not select Ms. Fialkowski because she did not have the necessary skills to function autonomously as a nurse practitioner in primary care in a satellite clinic setting without a physician present in the building. A nurse practitioner must be able to work without close supervision and basically alone. A nurse practitioner must be able to provide the patient history, conduct a physical examination, formulate a diagnosis and treatment plan, and convey this to the patient. These duties must be done without having to discuss every case with a physician.
>
> There were other factors that influenced my decision in not selecting Ms. Fialkowski. The preferable situation would be for the nurse practitioner to reside near the clinic. Ms. Fialkowski wanted to commute from Birmingham to Gadsden. An hour or more commute, potentially rendered impossible during inclement weather, would deprive Veteran patients of needed medical service. For example, during Ms. Fialkowski's interview, she did not focus on the care of the patients as her main concern for seeking employment. To the contrary, she indicated she wanted employment to obtain retirement benefits from the federal government. Her man concern was not for the welfare of the patients.
>
> The non-selection was based on my concern about Ms. Fialkowski's ability to practice by herself in an isolated situation, as well as my concern about her motivation and the quality of care she would provide to the patients.

*Stanton Declaration,* ¶¶ 3-7.

Dr. Stanton testified that the plaintiff stated several times during the interview that she wanted more federal time. He states that "[s]he commented that she knew people in

-17-

Washington. She very much wanted to continue her Federal career. And that if she were not selected, she would certainly make complaints." *Stanton Deposition*, p. 21. It was the doctor's impression that the plaintiff was less concerned about patients, based on an "absence of any expressed focus on patients." *Stanton Deposition*, p. 27. Stanton testified that he did not have any problem with social security numbers or nursing numbers. He also testified that he had no "particular concern related to whether there were missing papers or not in her application packet at the time that [he] interviewed her." *Id.* at 35. Stanton was not concerned about the plaintiff's references because he did not regard her as a candidate he was seriously considering for the position. Finally, Stanton testified that the person he hired, Karen Whisenant, had more experience working in autonomous settings.

The plaintiff contends that she had the skills to function as a nurse practitioner. According to her resume, the plaintiff held several nurse practitioner positions: Family Planning Nurse Practitioner, September, 1986 -- December, 1988; Pediatric Nurse Practitioner, January, 1988 -- June 1991; Adult/Geriatric Nurse Practitioner, March, 1995 — September, 1996; Nurse Practitioner (for Dr. Fialkowski), Emergency Department, March, 1996 -- 1997; and Nurse Practitioner, Dr. Tom Camp, Physicians Rural Health, August, 1997 -- present. The plaintiff also states that her "certification as a nurse practitioner presupposes her ability to sometimes function independently of, but

'in collaboration with,' a licensed physician. Ala. Code § 34-21-80 et seq; Alabama Administrative Code, Rule 610-X-9-.15." *Plaintiff's Brief*, p. 4, FN 1.

The plaintiff argues that the lack of autonomous skills stated by Dr. Stanton "is rebutted by [her] long and extended experiences, much of it as a Nurse Practitioner," and she points to her resume. *Plaintiff's Brief*, p. 4. The plaintiff states that the lack of autonomous skills stated by Dr. Stanton "is rebutted by [her] long and extended experiences, much of it as a Nurse Practitioner," and she points to her resume. *Plaintiff's Brief*, p. 4.

Stanton stated that the plaintiff had not worked anywhere he could recall where she had performed with the independence he required.[8] Dr. Stanton explained why the plaintiff's work in geriatrics, specifically, did not include the independent work required for the Gadsden position. As to the plaintiff's being a certified nurse practitioner, certification is not the same as being *experienced* as a nurse practitioner. However, the defendant conceded the issue of whether the plaintiff was qualified for this position when the Secretary stipulated that the plaintiff has made out a prima facie case of discrimination, because one of the elements therein is that the plaintiff was qualified for the positions she sought. The question, then, is whether Whisenant was *more experienced* working independently of a physician, as Stanton stated. The plaintiff must point to facts

---

[8] Some of the plaintiff's purported positions as nurse practitioner occurred after the date she interviewed with Dr. Stanton in or around November of 1996.

in the summary judgment evidence that would support a finding that Whisenant was not more qualified as a nurse practitioner for the Gadsden position. As the Secretary points out in his reply brief, the plaintiff's argument is lacking in specifics and thus fails to produce evidence challenging Stanton's claim that Whisenant was more qualified than the plaintiff to act as nurse practitioner.

As to Dr. Stanton's other, secondary reasons, the plaintiff states they are "suspect." *Plaintiff's Brief*, p. 4. The plaintiff contends that Stanton's concern about the fact that the plaintiff would have had to drive one hour to get to the clinic from her residence is bogus, in that inclement weather could prevent anyone from arriving at work on time, and that a commute of an hour or more is now commonplace in our society. The plaintiff further asserts that every person is concerned about job benefits.

The Eleventh Circuit has explained that the reasons given by a prospective employer for its actions must be more than merely suspect:

> A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.

*Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000.)

A long commute can be a reasonable concern where the employee is a nurse and the clinic where she aspires to work would often depend completely on her to deal with

patients because a physician would not be present. It is also reasonable for a physician to be sensitive to the reasons a nurse wants a job, and it is reasonable for a physician to want to feel assured that the nurse's highest priority is health care and patients, not her job benefits.

The plaintiff has failed to point to pretextual evidence sufficient to challenge any of Dr. Stanton's stated reasons for not selecting the plaintiff.

## Conclusion

The defendant's motion to reconsider the order granting the plaintiff's motion for leave to file further submissions is due to be granted and the order granting the plaintiff such leave is due to be set aside and denied and the plaintiff's August 28, 2001 submissions stricken and not considered.  The defendant's motion for summary judgment is due to be granted as to the ER claim and the Gadsden Nurse Practitioner claim, and those claims are due to be dismissed, while the motion for summary judgment is due to be denied as to the ICU claim.  An order in accordance with this memorandum of opinion will be entered.

DONE this _19 th_ day of February, 2002.

Robert R. Armstrong, Jr.
United States Magistrate Judge

-21-